Staples, J.,
delivered the opinion of the court.'
It is insisted by the counsel for the appellants, that the legacies bequeathed to Jennie, Sallie and Bettie Davis, should have been treated as a satisfaction of the debts due them by the testator, as guardian. In support of this proposition, the learned counsel relies upon the rule in equity, that where a debtor bequeaths a legacy to his creditor, of equal or greater amount than the debt, and of the same character, and pay *93 able after the debt becomes due, it is presumed that the legacy was intended to be in satisfaction of the debt. There is no doubt this rule still nominally exists; but the tendency of the more recent decisions i-, to consider the bequest a bounty, and not the discharge of an obligation. And the courts now lay hold of any circumstances, however trifling, for the purpose of repelling the presumption that the legacy was intended as a satisfaction of the debt. 2 Roper on Legacies, 1742; 2 Redf. on "Wills, § 52, '516.
So far as' this record discloses,the only debt of any importance against the testator, at the time of the execution of the will, was the one due to his wards. Aider satisfying that debt, the testator was possessed of an ample estate to pay all the pecuniary legacies, and also to make a reasonable provision for Mrs. Crouch and her children. There is no doubt that this was his ptirpose. Unmarried and intestate, he had no immediate family of his own to provide for. His nephew and nieces were very naturally the objects of his bounty and his affection. It is clear that the legacy bequeathed to R. L>. James was not intended as a satisfaction of the debt due him; because that deot was contracted after the will was executed. This legacy is the same in amount with those given to the nieces respectively. Why should the testator make this difference between them ? Why discriminate in this way, in favor of the nephew, and against the nieces? They were his wards; and it is reasonable to suppose his relations with them were more intimate, and his regard for them stronger than for either of his other .relatives. The very first clause in the will contains the bequest in then favor; thus showing they were prominently in his mind when he determined to make his will. “ Item first (he declares): I give to my nieces Jennie, Sallie and Bettie Davis, the sum of fifteen thou *94 sand dollars, to be equally divided between them.” This language, taken m connection with the other provisions of the will, and all the facts and circumstances of the case, plainly indicates, I think, that the testator intended a gift °f five thousand dollars to each of his nieces, without deduction or abatement. There was no error, therefore, in the decision of the Chancery court on this point.
In the next place, it is insisted that the court erred in holding that the pecuniary legacies constitute a charge upon the real estate. It is universally conceded that as a general rule the personal estate is the natural primary fund for the payment of legacies. Whether they are chargeable on the land, when the personal property proves deficient, is always a question of intention. When the charge is not created in express terms, it may be established by implication. And in seeking for the expressed intention of the testator, his words are to receive that interpretation which a long series of decisions has attached to them; unless it is very eeiffain they were used in a different sense. 1 Redfield on Wills, p. 433-435. Thus it has been held in numerous cases, that where pecuniary legacies alone are first given, and no part of the real estate is specifically devised, and there is a residuary clause, devising and bequeathing the residue of the real and personal estate, this operates to charge the entire property with the legacies. This rule of interpretation is founded upon the idea that the testator, in blending his real and personal estate into a common fund, plainly manifests his purpose to make no distinction between them. And inasmuch as the will contains no previous devise of any part of the real estate, the residue in such case can only mean what remains after satisfying the previous gifts. This is the well established doctrine of both English and American *95 courts. Greeville v. Brown, 7 House of Lords Cases, 688; Lewis v. Darling, 16 How. U. S. R. 1, 10; Wilcox v. Wilcox, 13 Allen’s R. 252; Shulters v. Johnson, 38 Barb. R. 80.
The only case cited by the learned counsel for the appellants, as establishing a different rule, is Lupton v. Lupton, 2 John. Ch. R. 614. That case is, however, easily distinguished from the one now under consideration; and is not in conflict with the authorities mentioned. Chancellor Kent was of opinion that the residuary clause in that case was nothing more than the usual formula in wills, indicating merely that the testator did not intend to die intestate as to any portion of his property, but to dispose of the whole of it. In the present case it is apparent that the. residuary clause was not designed simply to prevent a partial intestacy, from a failure to recollect all the testator’s property; but was intended as a substantial and beneficial bequest in favor of the residuary legatees.
In Lupton v. Lupton the will contained several antecedent specific devises of real estate, to which the residuary clause might be referred; thus giving it its appropriate construction. In this case the testator makes no specific devise of any part of his real estate; and he does not even refer to it in his will. Hor does he adopt the ordinary formula to which Chancellor Kent refers. By a single clause he blends his real and personal property into one mass; and declares, “ whatever balance I may be worth, I want given to my sister Ann Crouch and her children.” What did he mean by these words? Hid he refer to the balance of his personal estate simply? If his purpose was to devote his personal property only to the payment of the pecuniary legacies, and to give all his real estate to Mrs. Crouch and her children, nothing would have been easier than to have so provided in *96 plain and explicit language. The testator having made no specific devise of any part of his real estate, and ' having blended his entire estate into one residue, it seems to me the inference is irresistible that his intention was to give only the residue remaining after the previous dispositions of his will are satisfied.
It is also insisted that the executor ought to have paid the debts and legacies with the Confederate currency in his possession. If it appeared that the creditors of the estate were willing to receive payment in that currency,' there might be some reason in holding the executor responsible for his failure so to employ the funds in his hands. But, nothing of the kind is proved or asserted. As the Confederate notes were then greatly depreciated, and the debts contracted before the war, the fair presumption is, I think, the creditors were not willing to accept those notes in payment of their debts.
The same may be said with respect to the legatees.. The executor cannot be justly chargeable with a devastavit, in failing to pay them, even if there were no debts against the estate; unless it appeared that the legatees were willing to receive the Confederate notes, if they had been tendered. The ground is taken, however, that the legatees were payable in the currency in circulation at the death of the testator in 1868. It is true that a will of personal estate generally operates upon the pro- * perty possessed by the testator at the time of his death, whenever acquired; but in order to ascertain his meaning and intention, we look to the date of the will. 2 Lomax on Ex’ors, p. 8. The cases cited by counsel only show that where legacies are given generally, it will'be presumed that the testator intended they should be paid in the money of the country in which lie was domiciled and the will was made. And this rule will be observed, though the testator may change his residence and die in- *97 another country. This but illustrates the principle of looking, not to the death of the testator, but to the time and place of executing the will, in order to ascertain the objects of his bounty, and the kind or value of the currency in which they are to be paid. This is the'rule fairly deducible from all the cases. Holmes v. Holmes, 1 Russ, and Myl. R. 660; 2 W’m’s Ex'ors, 1232. This principle is not affected by the act of March. -3d, 1866, for the adjustment of Confederate liabilities. That act, by its very tenns, only embraces wills executed between the first day of January 1862 and the 17th of April 1865. It does not confer the slightest authority upon the courts to apply the scale of depreciation to legacies given long anterior to the existence of the Confederate currency.
It is next made a ground of complaint, that the executor did not use the Confederate notes iu the purchase of gold, and with that pay the debts and legacies. In the light of subsequent events, such a course would have been wise and judicious. Judged by circumstances then existing, it would have been regarded as an act of the greatest folly and rashness in a fiduciary. If, as was the prevailing opinion, the southern cause had been successful, such an act would have been regarded as an unjustifiable sacrifice of the assets and securities of the estate, and treated as a devastavit on the part of the executor. He was not bound to incur any such risk. The executor was required to act as a judicious man, looking alone to his worldly interests, would have acted under the circumstances; but he was not required to go beyond that.
Another ground of complaint urged by appellants, was the failure of the executor to invest the twenty thousand dollar legacy given to Ann and her children, in State stock® or bonds; as directed by the will. It is *98 to be borne in mind, that tbe condition of tbe country and of all securities, public and private, was altogether different in 1863 when the testator died, from what it was in 1859, when the will was executed. The executor being greatly embarrassed by this altered condition of affairs and other difficulties attending the administration of the assets, filed his bill in the Circuit court of Richmond, in order that the trusts of the will might be executed uuder the supervision of a court of chancery. In the progress of the cause, the court, upon the petition of the executor, entered an order or orders, authorizing him to invest the currency in his hands in Confederate or State securities. The investment was thereupon made in Confederate bonds. It is true that Ann and her children were alien enemies, and could not be served with process or brought before the court. Nevertheless, the executor had the right to apply to the court for its assistance; and the court had the right to make just such an order as was made. No existing investments were thereby altered, no rights were violated. Confederate currency received properly, in a due course of administration, was simply converted into Confederate bonds, until it could be applied to the claims of creditors or legatees. The estate, exclusive of this fund, and exclusive of the realty, was greatly more than sufficient to pay all the legacies. But for the loss of this property, the investment could now be made according to the directions of the will. And the burden would fall upon the residuary legatees, who were parties to the suit; must have been apprised of what was done, but made no objections to any of the orders entered in the cause. But let it be conceded that these orders were not binding upon the. non-resident parties. The act of the executor, in bringing the suit and invoking the aid of the .court, evinces, I think, entire good faith, due diligence, *99 and a laudable desire to protect the rights of creditors and legatees. And I do not see how it is possible, consistently with the rulings of this court, to throw upon him the loss of this fund. Eliot v Carter, 9 Gratt. 541: Myers v. Zetelle, 21 Gratt. 733.
It was argued, however, that as the court authorized an investment in State bonds, and the testator so directed, those securities should have been selected by the executor. The executor states that he made no investment in the name of Ann and her children, because they were alien enemies; and he was not notified that the Confederate authorities would take steps to sequestrate their legacies. He did not deem it advisable to purchase State bonds, because they were greatly appreciated, as compared ivith the currency. He, therefore, concluded to make what he considered as merely temporary investments in Confederate bonds. They were regarded by many of the most sagacious business men of the country as equally safe with any other securities. The executor honestly exercised the discretion vested in him by the court in purchasing them.
If we are now to say that he is liable, because he did not purchase State bonds rather than Confederate, we must declare that he had no discretion in the premises. Ve must hold, that whatever may have been the condition or the resources of the estate, or the circumstances surrounding the executor, he could not make, and the court could not authorize, any disposition of the funds, until this legacy was secured. At that time there were large claims against the estate, which' could not be paid. Hntil they were settled, however, the executor was under no obligation to pay legacies or make investménts for legatees. He had the right, under the sanction of the court, to retain the funds under his control until the liabilities of the estate and the rights of all parties were *100 'settled and adjusted. If loss lias thereby ensued, it is not fairly attributable to any breach cf duty on the part of the executor; and the Chancery court very properly so decided.'
The appellants’ exceptions to the commissioner’s report, from Eo. 1 to Eo. 8 inclusive, also Eos. 11, 16, 17 and 19, were properly overruled. In regard to the questions arising under the fifteenth exception, there is more difficulty. That exception is based upon the failure of the executor to collect debts due the estate, or to institute any proceeding to secure the same. A list of these debts is reported by the commissioner, amounting to forty-eight thousand five hundred and eighty-five dollars and' twenty cents. One of the witnesses examined expresses the opinion that but little could have 'been realized from these claims, and that many of them were not recognized by the testator as existing debts. It seems, however, that a large number of the debtors reside now, or did reside, in Virginia; and a majority of these is reported by the commissioner as good, or in doubtful circumstances. And this is all the information we have upon the subject. The Judge of the Chancery court, in the course of his opinion, said: “ That as to the claims in Virginia uncollected, no proof has been brought before me, showing that any of these claims have been lost by the negligence or improper conduct of the executor.” The learned Judge is not entirely correct in his statement of the principle. The executor was bound to adduce the proof in his exculpation. When assets are -traced to his hands, it devolves upon him to showr why they have not been collected; and not upon the legatees or distributees to establish misconduct or negligence. Tebbs v. Carpenter, 1 Mad. R. 290; Lawson v. Copeland, 2 Bro. Ch. Cas. 130.
It is not intended, however, now to decide any of the *101 questions arising under this exception. There ought to be further inquiry as to the claims upon resident debtors, whether any of the debts reported as doubtful or worthless are now available, and whether the executor, by instituting suits at any time since the death of the testator, ought to have collected any of them, or secured satisfactory liens upon real estate.
Appellants’ exception number 10, in relation to the claim of R. D. James, the executor, against the estate, amounting to $5,760 13, was properly sustained, for the reasons given by the Judge of the Chancery court. No error was, therefore, committed in that particular, to the prejudice of the appellee.
The decree aeeirmed, except as to the debts in Virginia uncollected by the executor.